So our next case of the morning, 415-0131, People of the State of Illinois v. Heather Lamie. Is that the right pronunciation? It is, Your Honor. For the appellant, Mr. Rinker, for the appellee, Mr. McNeil, you may proceed. Thank you, Your Honor. May it please the Court, opposing counsel, there are at least three issues that I would wish to address during the course of this oral argument. The first is the impact that a non-pattern jury instruction had on the jury's ability to appropriately deliberate and give weight to a piece of evidence admitted in this case. Now, as Your Honors might recall, during the course of this trial, a text message was admitted over defense objection for a limited purpose. That limited purpose was for the effect that it had on the defendant, Heather Lamie, if any. Now, we don't disagree that a trial court, within their discretion, has the ability to offer a non-pattern instruction. But, in People v. Bush, the Illinois Supreme Court has stated that if a non-pattern instruction is to be given, it must be simple, concise, brief, non-argumentative, and certainly must be an accurate statement of the law. Was there a pattern jury instruction that applied? There was no pattern jury instruction for this, Your Honor, in this case, because it was a limiting instruction being given for a text message. They were attempting to instruct the jury as to what weight they were to give that particular piece of evidence. It was admitted for the limited purpose of showing the effect on the defendant, Heather Lamie. However, if you read the specific instruction itself, it gets confusing as to what weight the jury is to give this particular instruction. Was defense counsel given an opportunity to have input on the instruction language? He was, Your Honor. Off the top of my head, my recollection of this is that the instruction which was ultimately given was not one which defense counsel agreed with the particulars of the language. I don't have the record citation for the court on that particular matter, but that is my recollection in this case. Now, was there an alternate instruction or substitute instruction offered? I do believe that an alternate instruction was given, and that was provided by defense counsel. However, the trial court did not offer that particular instruction. Wait a minute. You think that defense counsel came up with an instruction and gave it to the judge? That's correct. I did not see that anywhere in the record. From my recollection of reviewing that, and certainly, Your Honors, that could be something I am misspeaking about, was that defense counsel, at the very least, disagreed with the instruction which was tendered here. I'm not even sure that's true as to form. Of course, on the law, he was not happy about the text messages coming in, but I do not recall him disagreeing with the instruction itself, nor do I recall him offering, when he was given the opportunity, an instruction. Your Honor, if I may just address the particular instruction which was ultimately submitted to the court, if Your Honor will allow. The particular instruction which we've taken issue with is the non-pattern instruction, and in this case, when you look at that particular instruction, as we've submitted in our brief, the instruction itself has an internal conflict about what weight to give the evidence which was ultimately admitted over defense objection. Certainly, just looking at the instruction in itself, it is not a simple brief resuscitation of the law, but rather is somewhat lengthy and a little ambiguous and confusing as to what weight should be given. Our particular issue here is what we believe is a conflict with the weight to be given that particular piece of evidence. If you look to the last portion of that particular instruction, it states, on the one hand, that it's to be used to the effect that those texts had upon the defendant, Heather Lamey, if any, and then continues on to state, as it relates to show her state of mind. Now, P. B. Bush stands for the proposition that if there is a conflict as to what the instruction is to do, or what the jury is to do with the weight of the evidence which is brought in, then that is reversible error. In this instance, this particular instruction could lead a reasonable juror to believe that, on the one hand, they could use that text message for the effect on the defendant, and on the other hand, to show her state of mind. That is the conflict which we believe exists, and certainly the issue which we take with this is that that conflicting instruction deals with a very contentious piece of evidence which was admitted over defense objection in this case, and the weight that the jury is to give that particular instruction is important to the outcome of this particular matter. Well, what about the statement in the instruction that says, his texts are not admitted as substantive evidence? What does that mean? We do recognize that the instruction, at least, attempts to limit the purpose for which this was admitted. The concern is, is we're dealing with lay jurors who are not attorneys, and as they receive this instruction, does its length add to its confusion? My point is, aren't the texts substantive evidence of the effect on the listener? Your Honor... As opposed to impeachment evidence? Isn't substantive evidence? Your Honor, I believe that the ruling the trial court made in this instance was that it was not being offered for its truth as substantive evidence, but rather for the limited purpose to show the effect that it had on the defendant, and that was the ruling the trial court made. So in drafting this particular limiting instruction, they were attempting to comply with the court's ruling in drafting it, so that way the jury would give the appropriate weight to the evidence which was allowed to be brought up before the jury. But the trial judge drafted this instruction. I do believe so. That's correct. You said they are drafting it. Well, I do believe that there was a conference regarding the instruction itself. There was a dialogue on the record about the contents of the instruction and... By the way, the state submitted an instruction. I do... But the court rejected the state's version. I do believe that the instruction which ultimately was given to the jury was one that was drafted by the trial court itself. But certainly the issue which we take with it is that we believe that instruction conflicts with the law that they are to apply and is confusing to an extent that a reasonable juror would not know what weight to actually give this particular piece of evidence, which would warrant a remand in this particular instance. Are there any other questions with respect to that particular issue, Your Honors? Proceeding on to the second issue, in this particular case, we also have articulated in our brief the error that occurred in protecting the constitutional right to a fair and impartial jury in this case. Now, through this particular instance, the court will recall that two different instances during the course of this trial, there were issues raised that called into question the impartiality of the jury. The first instance came briefly after the jury was impaneled, and a note came up to the trial court to address some concerns about what was occurring in the deliberation room right before opening statements. Now, we stand for the proposition that the trial court has an affirmative obligation to protect the constitutional rights of the defendant, and in this instance, that constitutional protection required the court to inquire in more detail to what exactly occurred in that deliberation room, and they failed to do so. They did bring out that offending juror and re-questioned that individual about some surface or cursory issues, but they failed to specifically ask him what exactly was said in that deliberation room. Now, there's some passing reference made by the juror himself that's noted in the record and is noted in opposing counsel's brief, but we believe that they had an obligation to then question the actual juror who wrote that note to determine whether or not they were impacted by the statements which were made in the jury deliberation room. Well, the statements didn't relate to the merits of the case, did they? Your Honor, I think... The statement was, the judge mowed my lawn 30 years ago, and I used to babysit the state's attorney, which apparently was not even correct. Your Honor, I think part of the problem is that's all that was referenced by that juror, but no specific inquiry was made of him as to, hey, what did you specifically say back there? And no reference is made to the court inquiring of him or other jurors to determine what specifically was said. Well, the juror sent a note out and said what was said. Your Honor, in my review of the record, that note was not made part of the record which was provided to me. I did inquire with the clerk as well as the defense counsel in this case, and they did not have a copy of that note to be made a part of the record for us to argue here today. I'm not sure if the record which this court received did include that particular note, but we did have... But it stated on the record what the note said. I don't believe that the note was ever specifically read into the record. There's a conversation about the fact that there was a note, that they needed to address some issues regarding the note, but the note itself... And the contents. I mean, how do we know? I mean, because it related to the judge mowing the lawn of the restaurant owner 30 years ago. So somehow that had to have been reflected in the note. Your Honor, my recollection of that particular reference regarding the mowing of the lawn, and I think it was the babysitting, that that was something that was brought up during argument. It was also something that came up from that particular juror. He made some references with respect to that, but nobody ever actually read the contents of the note into the record. Therefore, we don't know what the specific comments that were made were. I think that the court had an affirmative obligation to inquire of this other unknown juror that obviously felt so impacted by what was said back there that they needed to warn the court about what was going on. Part of why I think that this is important is because we do know later on during the course of this trial that two other jurors had to be removed for cause for prejudging this case. Now, at that point, we don't know sitting here today having reviewed the record whether any of this is related to one another, but certainly the mere question regarding the impartiality of a jury in a murder case calls into question whether or not her constitutional rights were protected. There was nothing in the record, Mr. Rinker, to reflect any relationship between the two jurors being removed and Mr. Lesters. Those jurors were removed because they were commenting in open court while an expert was testifying and were overheard by the trial judge to say, I agree. Your Honors, I think part of the issue for us is that we don't know that because no inquiry was ever made. You don't know what? We don't know whether there was any connection between the conduct of those two jurors and what this particular offending juror stated before the opening statements even occurred. I think what we do know is that it shows an objective basis that there is some impartiality issues on this particular jury. Now, I think an inquiry needed to be made. Certainly, the trial court at this point is aware of at least two issues that have arisen objectively through this process that could call into question the impartiality of the jury as a whole, but they failed to inquire of the other jury members as to whether or not there was any issues. The case I've cited in my brief, People v. Smith, does reference the court's obligation to consider prejudicial content, but then most importantly to consider the effect that that prejudicial content had on the impartiality of the other jurors. I think that's the issue for us here today. What was the prejudicial conduct first? And then two, did the court attempt to inquire in any way as to whether this conduct or content impacted the impartiality of the remainder of the jury panel? Did defense counsel ask the court to interview the jurors? Unfortunately, no, Your Honors. And as you look through my brief, another issue which we do raise is a point of ineffective assistance of counsel. And an argument which we set forth in our brief is that that was ineffective on the trial counsel's part by not requesting the trial court to actually make that inquiry. So one, at the very least, the record could be perfected about what potential impact these particular matters had on the impartiality, but at the very least, to render appropriate opinions to give the trial court the right opportunity to make the right call about the jury panel as a whole. Particularly here for us, when we're looking at this, we know that the mere possibility of prejudice is sufficient to grant a new trial in a murder case. And in this instance, there's two objective bases for which this court could state there's a problem with the impartiality of this jury. And certainly, in this instance, a new trial could be warranted on this grounds. Are there any other questions with respect to the impartiality issue, Your Honors? Moving into the third argument which we wish to address today is the issue regarding the cumulative error of certain statements made by the prosecutor during closing arguments and what impact they would have had on the defendant's conviction. In this particular case, we're referencing particular comments which were made. The first is an apparent mischaracterization of the law to be applied to the facts in this case. What we're talking about there is, in this instance, we know that the instruction provided to the jury for deliberation purposes was a count of first-degree murder, which required the state to both argue and prove that the defendant acted knowingly in the conduct that arose. However, through the course of the prosecutor's closing argument, they referenced the defendant's conduct as snapping. Now, as we've cited in our brief and as you can read from a cursory review of the record, that term snapping comes up numerous times throughout the closing argument. And it's brought up in context with the prosecutor making an argument similar or akin to the fact that the defendant actually lost control. The prosecutor states that they don't have to prove intentional or premeditation, that the defendant in this case is not a cold-blooded killer but a hot-blooded one. Now, by arguing this actions on the part of the defendant that she snapped or lost control, lost her temper, we'd argue that they're arguing more of a mental state to involuntary manslaughter as opposed to the knowledge element or mental state requirement for that of first-degree murder. Because they've argued that she snapped or lost control through the course of this conduct, but the only instruction in front of the jury is that of first-degree murder or knowledge, then it becomes an improper argument as to the mental state required to commit this particular offense. The second issue is with regards to a comment made... What if I said she snapped and her anger rose to the level that she intended to do bodily harm, great bodily harm and knew or should have known that that could result in death? I think that that's a different argument. And I don't think that... Because I used an extra word? I think that adding the intent language to that certainly changes the argument itself. But arguing that she just snapped alone, lost control, attempts to fill a gap that the prosecution knows it has in this case. That gap is that prior to the text message introduction, there's no evidence that's been adduced at trial that there was any abuse in this household, that there was anything with respect to why this particular defendant would have committed this act on this day. The prosecution recognizes this gap, that they're going to need to argue that this person's actions rose to a level of that day where they knowingly acted in this regard. And I think they purposely avoid using that terminology as much as possible during the course of closing and instead argue that her actions are akin to this snapping. I think the reason for that is they recognize that the evidence is not particularly strong to her acting knowingly in this regard. The issue we have with this particular argument is we think that this argument is more closely affiliated with an involuntary manslaughter instruction. No request was made for an involuntary manslaughter instruction and there certainly was no involuntary manslaughter instruction given to the jury in this particular case. Looking further, the statements made by the prosecutor regarding the text message that we've already referenced here today with the limiting instruction of beat her ass. Now, that becomes important because I think our argument is that we're not looking at any one of these errors in a silo, but rather the cumulative effect that these errors would have had on the defendant's conviction in this case. That text message, beat her ass, as we've referenced, was offered for a limited purpose. And during the course of closing argument, the prosecutor references the beat her ass language by basically referencing that this was a directive given by the defendant's husband and that she ultimately acted upon this directive when she committed this offense. Certainly that flies in the wind of the actual evidence which was adduced at trial, but certainly when we consider that a reference to a text message which was admitted for a limited purpose must be put into the context for which it was admitted and nothing more. And in this case, it was offered for the limited purpose of the effect on the listener, if any. By arguing that the text message beat her ass somehow shows the, we'll call it, character or culture of this home as being an abusive home, assisted the prosecution in bridging that gap which we already referenced earlier regarding why somebody would commit this particular offense or how this particular offense would have got to the point where the person is knowingly acting in such a way as to cause great bodily harm or death. In our brief, we have certainly referenced the case of People v. Robinson where in that court, the appellate court rendered an opinion that because the statements which were offered for a limited purpose were always viewed in the context for which they were offered by the prosecutor, it did not offend the limiting instruction. It did not go beyond the purpose for which that particular piece of evidence was admitted. Now in this case, we argue that they have failed to actually combine that language with the limiting instruction and as a result, it's error. In conclusion to this matter, Your Honors, we believe that there's sufficient cumulative error in the prosecutor's arguments to render a decision that even if each one of these particular issues in a silo is insufficient to warrant a new trial, the cumulative effect of these errors is sufficient in a murder case such as this. The case of People v. Blue stood for that exact proposition and that's the proposition which we've cited to the court here today that you could essentially render that all of these errors we have raised by themselves are harmless. Certainly, we would assert that they are not harmless, but ultimately when you consider them in the totality and you consider them in light of the evidence in this case which was entirely circumstantial, it now goes beyond what is appropriate for the jury to ultimately hear and was a material factor in rendering a conviction in this case. Thank you. Thank you. We'll hear from you on rebuttal. Thank you. Please, the court. Counsel. As for the jury instruction issue, I cited People v. Bannister, the Illinois Supreme Court case, stating that jury's instruction should not be misleading and confusing. Of course, their correctness depends not on whether defense counsel can imagine a problematic meaning, but whether ordinary persons acting as jurors would fail to understand them. It's important in this case because it takes a lot of jumping through hoops to even come up with a misleading or problematic meaning with the subject instruction here. The text messages sent from Josh Lamey's cellular phone to Heather Lamey's cellular phone are not admitted for their truth, and you are not to use them as evidence against the defendant, Heather Lamey, in determining her guilt or innocence. These texts are not submitted as substantive evidence. Rather, they are only to be used by you for the limited purpose to show the effects those texts had upon the defendant, if any, only as it relates to show her state of mind at or about the time the text exchange took place. Defense counsel's argument seems to be that this was too comprehensive or too specific of a limiting instruction. I would argue that the only reasonable interpretation of this instruction is exactly as the plain language of the instruction expresses. It's also important to look at all of these issues with the remembrance that all of the evidence against the defendant in this case was overwhelming. That was the first argument. Whether it was a directed verdict argument or a sufficiency of evidence argument was unclear. By the briefs, however, it's clear that the evidence against the defendant was overwhelming in this case. We have to remember that when looking at these issues, which weren't preserved for review anyway, when looking at them through plain error analysis... Let's back up a minute to that jury instruction. Yes. Is there a difference between the effect it had on the listener, the defendant, and her state of mind? The effect on the listener could be argued that her husband would be supportive of her using corporal punishment and that the words, beat their ass, is language that's often used in relation to, you're going to get a swat across the rear. Whether that's acceptable or not, I will be supportive of the means by which you discipline a child in this situation versus then the state of mind, upon which this could have had some effect, this earlier statement, but it leads to... Well, the whole point of the husband's text messages were to show her state of mind. This wasn't offered for the truth of the matter asserted. No truth was asserted. This was a suggestion or a command by the husband to defendant, which was rejected in the very next text. The very next text from defendant was, no, I shouldn't do that. I would do more than hurt her feelings. If anything, this shows a rejection of the suggestion by the husband to beat Kiana's ass. At any rate, any possible prejudice or improper way to apply these text messages was clearly... The limiting instruction was not problematic. The limiting instruction was specific and cured any possible prejudice that could have happened, admitting these text messages, which I would submit they were completely admissible because they couldn't possibly have been admitted for the truth of the matter asserted because no truth was asserted. The subject, the most focused on text being the beat her ass one, still didn't say beat her ass like you always do or I can't believe you beat her ass or anything like that. It was a suggestion or a command, which was promptly rejected by the defendant in that text exchange. However, the probative value was high. It clearly showed... I asked about whether it was confusing. Okay. But the point of the text messages even being admitted was to show defendant's state of mind, which they did. It showed an increasingly frustrated and angry defendant based on her four-year-old's unruly behavior. By the way, the last text message was sent at 12.40 and it said that Kiana threw dog food everywhere. The 911 call was seven minutes later from defendant saying that Kiana was unconscious. So clearly any abuse happened in that seven-minute window, which defendant was the only adult in the house at the time and the only person capable of inflicting these severe injuries. You've done a good job of presenting additional parts of your argument in response to my question. You've answered my question, so we'll move on. All right. I just wanted to answer it thoroughly, sir. You did, sir. As for Juror Letzos, his relationship with the state's attorney here was during voir dire. This was before the trial started. It was clearly on the record and it wasn't a time when the jury was already picked or anything like that. He stated, the state's attorney has eaten in my restaurant many times over the 30 years, more than 30 years that I've owned it. This is a small town. Pontiac. He didn't talk about babysitting the state's attorney during the questioning. Was it the state's attorney that he supposedly babysat or was it the judge? No, he mowed the judge's lawn. According to the juror's note, he had mowed the judge's lawn 30 years ago and also had babysat or set up the state's attorney. Wasn't it determined that that was a mistake? Well, the state's attorney denied he'd ever been babysat by the state's attorney. Well, it doesn't make any difference whether it's true or not. Can you imagine for a moment, sitting on the other side, if you had been defense counsel, would you have wanted or would you have asserted, Judge, you really need to go further into this note. Well, the note... Who wrote it and why they wrote it and what's going on with the jury that these comments are being bandied about. I mean, I take it that's the note, sort of as you ought to know, that this was what was said in the jury room. Or that these are topics that were mentioned in the jury room. Yeah, it seems that it was probably mentioned offhand by Juror Letzos. Then the trial court did bring Juror Letzos out and asked him questions. I don't care what he said at this moment. He's conceding what he said. The question is, did it have any effect on the other jurors? I mean, there was nothing in the record... There must have been some effect or the note wouldn't have been sent out. I think they wanted to... a reasonable person wants to be completely up front and forward about whatever kind of connections are connected by the state's attorney or the defense counsel and potential jurors. In this case, the picked jurors. Well, a reasonable juror took the initiative to send out a note. Which means that they thought what was said was either improper or could have the potential to influence other jurors or could have the potential to affect Juror Letzos' deliberations. I took it as a note to just say, hey, by the way, there's another connection here. He babysat the state's attorney when he was a child and apparently you mowed his lawn, which is what he talked about. There's nothing in the record to suggest any kind of influence or any kind of failure of impartiality by Juror Letzos. In the note, Juror Letzos stated unequivocally that he would be fair and impartial. Again, on the second round of questioning, there was nothing to suggest that he wasn't fair and impartial by simply owning a restaurant in a small town. But that doesn't address the question of whether it had any effect on any of the other jurors. What does the other jurors say? You follow up with that juror and the juror says, if you end up examining the juror that wrote the note, why did you send out the note? Well, I don't think this juror that you picked for this jury wasn't thorough in his explanation of these contacts. Man, he's got connections with the judge, he's got connections with the prosecutor. He's going to be, the juror says, I think he might be biased toward the prosecution. Still, even if that was the note, what point would be to question the juror who wrote the note? The only thing that was expressed in the note was that this juror mentioned he... Was the note read into the record? No. So we know exactly what the words are? We can't assume the worst. We can't assume it. We can't assume anything. What's on the record is that... Defense counsel didn't ask for the note to be read. Defense counsel didn't ask for the judge to pursue the effect that it could have had on jurors. I'm not just making this stuff up. We can presume the trial court addressed the contents of the note when they brought juror Letzos out. Which was only that he had his yard mowed by the judge 30 years ago. I'm not sure whether you're just totally missing. I'm not concerned about his candor when he's finally brought back out. My question is, or a question that could be asked, if I had been defense counsel, I would have wanted to know what effect juror Letzos banding this stuff about in the conference room, or in the jury room, and discussing his connections with these people, some of which were known, and what was the mindset of the juror that sent out the note? Because it's clear that it had some effect on that juror, or they wouldn't have sent out the note. So I want to know more. That's what I'm saying. And bringing out Judge Letzos says, yeah, I said that stuff. And Brett? Yeah? What next? You're not conceding that defense counsel would have done a better job by inquiring further, or asking the judge to inquire further? I would say that the state would argue against that, and that would be ultimately rejected, because nothing in the record suggests any impartiality. But the point is, is you make a record. And the point is, defense counsel failed to make a record of, one, making the request, and two, the judge might have been happy to comply. They might say, you're right, we probably should know a little bit more about this. And I would submit any kind of extensive knowledge was extracted by questioning Juror Letzos, and there was no need to question the jurors that wrote the note. How could Juror Letzos know what effect his comments had on the rest of the jurors? I don't see how. I can't imagine how just him commenting that he knew the judge 30 years ago, or that he babysat the state's attorney 30 years ago, could have any effect on the potential jurors. This guy's from a good family. I babysat. He's a straight arrow. This is a good man. You can believe he wouldn't be bringing this case unless he thought such and so. And the judge, you know, great guy. Real strong community member. I.e., whatever rulings he makes are correct. I think that would be in the note. It was not in the note. There's nothing in the record to suggest that was in the note. Yeah, because there's nothing in the record. I mean, we have the contents of the record. I've taken up too much of your time. I'm sorry. Go ahead. No, I'm not sorry. We have the contents of the record that suggest that was in the note was that he babysat the state's attorney 30 years ago. That's like saying what somebody reports about a contract is what really was in the contract. It is inexcusable not to have gotten the content of that note explicitly in the record. And I think it's a problem that he didn't pursue further. That doesn't mean that the state loses. I just mean in the context of the case, the process that occurred, those things should have been done. And I would argue that the process that occurred was not objectively unreasonable. Counsel's performance wasn't objectively unreasonable. I figured you would argue that. At any rate, it was. I'm going to let you move on. Again, we have to remember the burden of establishing that a juror is impartial is on the party challenging that juror, which the jury was never even challenged at this point. The mere suspicion of partiality is not enough. That's well settled. As for the text message or the improper remarks for the elements of murder, the prosecutor did not mischaracterize the elements of first degree murder. He specifically went through the elements of first degree murder. So the question is strong probability. Did the defendant know that her acts were going to cause this great bodily harm? How would they not? Kiana was 39 and a half inches tall and weighed less than 50 pounds. Any force being exerted upon her, there is strong probability that it's going to cause great bodily harm. This was not a mischaracterization of the first degree murder. The point of the defendant snapping was merely the narrative theory of the case from the prosecution from the beginning. The defendant was growing increasingly frustrated and angry at the four-year-old's unruly behavior. She irrationally snapped, causing this severe abuse. Because she snapped doesn't mean that she didn't knowingly cause this severe abuse. And the elements of first degree murder were laid out clearly. The jury was properly instructed on the elements of first degree murder, and the prosecutor did not fail or did not mischaracterize the first degree murder elements. He did the exact opposite, actually. As for arguing the truth of the matter of Josh's text messages, Josh is the husband in this case. During closing argument, this is all the prosecutor stated. The girl is getting battered. The girl is getting beaten. The text was beat her ass. I don't think that would be a good idea at this point. But once it is a good idea, then this is what happens. Clearly what he's saying, the narrative, she gets a text beat her ass, but then she says, I don't think that would be a good idea. Then the narrative theory kicks in. But when it is a good idea, obviously this is the horrible result that happened. This is not arguing the truth of the matter. Then, during defendant's closing argument, counsel stated, Josh did not mean beat her ass. I don't know what evidence this was based on, but that's what he said. And in fact, counsel, quote, can't think of anything that he had meant less. So clearly defense counsel opened the door to the meaning of Josh's text message by rejecting the plain language of that text. Prosecutor then, in rebuttal, commented, as he was allowed to do, based on the defense counsel opening the door. He then commented further on the text message. However, this was clearly allowed based on the defense counsel opening the door to this very subject. He was not arguing the truth of the text message. He was commenting on defense counsel's argument. Well, doesn't he say something like, he quotes the beat her ass, and then he says, what kind of a house is this? What's going on there? When you have somebody saying that. Right, that was in rebuttal. That's arguing the truth of the matter. That was in rebuttal. There was a limiting instruction. Yeah, there was a limiting instruction. The state's attorney, in my opinion, wasn't following the limiting instruction at that point. He's arguing, this is substantive evidence of what's going on in that home. Based on defense counsel's argument prior, saying he didn't mean beat her ass, there's nothing he could have meant less. That's what defense counsel stated in his closing argument, thereby opening the door for a prosecutor to comment on. The state never objected. Well, they can at least comment on it. Defense counsel never objected either. There were no objections during the closing argument by either side. But most importantly, therefore it's forfeited. It wasn't preserved. Most importantly, the jury was properly instructed with the standard instruction that opening and closings aren't evidence, and it's well settled that that can cure improper prosecutorial or defense counsel remarks in argument, especially when it's, in this case, it's few sentences in rebuttal argument of a very long and complex overall closing argument. So it's the last thing the jury hears. Well, I don't think it was the last sentences of his rebuttal. I understand that. You talk about building a narrative impact. What kind of house was this? That would have been the last thing I would have said if I was the prosecutor. I don't think that was the case, because it was a comment on defense counsel's specific closing argument. If he wanted to say that, he would have said it in his initial closing argument. He didn't. The only thing he said in the initial closing argument was the evidence. He didn't argue the truth of the matter. It was actually more advantageous to say it in rebuttal. So he was counting on defense counsel? No. He did it spontaneously. But doing it spontaneously because the other side gives you the opportunity to do it doesn't mean that it's either okay or that it's weak. I think it's powerful. At any rate, this was clearly commenting on an open door, and the jury instruction properly limited that prejudicial impact of any improper remarks anyway. It clearly doesn't rise to the level of plain error. Are there any more questions? Thank you. Mr. Rinker, you didn't argue about the sufficiency of the evidence here today. I did not, Your Honor. I thought your brief was a little confusing with respect to arguing error on the denial of the directed verdict in the JNLV. So can you clear that up? Certainly, Your Honor. And it should have been something that I clarified for the court. I apologize. I believe it's on both fronts, and certainly looking at the evidence in this instance, although opposing counsel stated that this was overwhelming evidence, we would have to disagree. Certainly in this particular case, the state is relying upon the circumstantial nature of this particular incidence and really a reliance on their expert witnesses in saying that this could not have been self-inflicted. This could not have been something that a small girl had done to herself. They failed to address or lay out the issue of whether or not this could have been an accident of some sort. Self-inflicted and accident, in my opinion, are two different things, and certainly none of these expert witnesses that the state offered were able to pontificate about any number of scenarios that could have arisen where these types of injuries could have resulted from something other than Heather Lamy having been the one to perform them. I don't believe that the evidence was sufficient to support a finding of guilt in this case, and I also don't believe that the evidence was sufficient from a prima facie case standpoint where the motion for directed verdict should have been denied. So I'd be arguing that on both fronts, Your Honors, and certainly I do apologize for not having clarified that sufficiently in my brief for both all of Your Honors as well as for opposing counsel's purposes. If I may, Your Honors, I would like to address some of what was just stated during the course of opposing counsel's argument. First, looking to the jury impartiality issue, Your Honor was asking questions regarding the defense counsel's non-effort, I guess would be the best way I could put it, at even attempting to clarify the record in this case for his client. And I think rightfully so, if I'm going to argue that the trial court has an affirmative obligation to actually follow up on these issues to protect the constitutional rights of my client, then absolutely the attorney has an obligation as her defense counsel to at the very least set forth an argument to at the very least clarify the record with respect to this issue. There is a motion for cause which is made by defense counsel shortly after Juror Lestos is brought back out for re-questioning, but he does not request the trial court actually inquire of the particular juror who wrote that note. He does not even attempt to clarify the record with respect to what effect this particular conduct could have had on that juror's impartiality. Certainly looking at this record, all we know is that the person felt concerned enough to write a note. And defense counsel had an obligation to actually clarify this issue and ensure the impartiality of the jury that's going to render a verdict on his client's behalf. And that required him to follow up with that particular juror, question them with respect to, okay, what was said? Give me the specific facts. What was your belief about what was said? Okay, now that we all know what was said, what impact did that have on you? If after that inquiry of this other juror who wrote the note, it's determined that there was more that was stated in the deliberation room as opposed to what was talked about by Juror Lestos, then we might have an issue with the remainder of the panel. Were they present? Were they close by? Was this said to the group as a whole? Or was it said to just you near the water cooler? We don't have that perfected. And yes, I stated earlier that trial court has an obligation to do this, but I also argued in my brief that the defense attorney has an obligation under the objective standards of reasonableness as the defense attorney in this case to ensure that he tried to strike that juror for cause if they were impacted by what was stated in that deliberation room. And in failing to do so, he fell below that standard that would require this court to send this case back to the trial court. Very briefly, looking at the rebuttal regarding the instruction, I think the issue comes down to the effect language of that. We have the effect on the defendant, Heather Lamey, versus her state of mind. No effect language is used in that very last portion. That could lead a reasonable juror to simultaneously believe that they can use this text for the effect it had on her and also for her state of mind. Because that is a conflict in the law, that the ruling of the court was it can only be used for the limited purpose of showing the effect it had on the defendant's state of mind, if any, period. That is a simple, concise statement of the law that accurately reflects what the jury is supposed to do with this instruction. But that's not what was given to them. And it's because of that that the jury could have given that this instruction was conflicting and therefore warrants a remand in this particular case. Thank you. Thank you, counsel. We'll take this matter under advisement and await the readiness of the next case. Thank you very much.